```
    G7RHDOEC

    UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
    ------------------------------x

    JANE DOE,

                    Plaintiff,

              v.                           15 CV 7726 (JMF)


    STEVEN KOGUT,
                                           Conference
                    Defendant.
    ------------------------------x
                                           New York, N.Y.
                                           July 27, 2016
                                           2:05 p.m.
    Before:

                   HON. JESSE M. FURMAN,

                                           District Judge

                         APPEARANCES

    DEREK T. SMITH LAW GROUP, PLLC
         Attorneys for Plaintiff
    BY:  ZACHARY HOLZBERG

    NESENOFF & MILTENBERG
         Attorneys for Defendant
    BY:  PHILIP A. BYLER
```

1          (Case called)
2          MR. HOLZBERG:  Good afternoon, Your Honor.  Zach
3     Holzberg of the Derek Smith Law Group for plaintiff, Jane Doe.
4          THE COURT:  Good afternoon.
5          MR. BYLER:  Good afternoon, Your Honor.  Philip A.
6     Byler from Nesenoff & Miltenberg, representing the defendant,
7     Steven Kogut.
8          THE COURT:  Good afternoon.  So I'm told by Judge
9     Netburn and infer from your presence here that the case did not
10    settle; correct?
11         MR. HOLZBERG:  Correct.
12         THE COURT:  All right.  So we have until August 2 to
13    complete discovery.  Talk to me.  Have you settled on a
14    deposition schedule?
15         MR. BYLER:  Your Honor, I did propose dates for the
16    party depositions.  We don't have control over the nonparty
17    witnesses, and there's a lot of them.  And those dates didn't
18    work with Mr. Holzberg.  I quite frankly have to ask, and I
19    think my adversary will agree with this, that we get more time
20    for discovery to do the proper depositions in this case.
21    There's no way practically that nonparty depositions can take
22    place before August 2, and we've got to figure out dates for
23    the party depositions.
24         I also have to raise the fact that probably there's
25    going to have to be some supplemental document production.  I

just got their documents two weeks ago, and I got 36 pages with a lot of objections. I want to try to work that out with counsel. I think there are other documents coming my way, and I want to make sure our document production is complete.

I realize that I'm basically requesting the Court to exercise discretion, but given the fact that we did not have a settlement today, it appears that we have a litigation that's going to be a serious one over some relatively new New York State and New York City provisions.

One other request I was going to make is permission to move to amend my answer to add an affirmative defense to make clear that if you try to apply these statutes with just a preponderance of the proof standard, that you have a constitutional issue. The first claim that plaintiff asserts is under New York CPLR 213-c which gives a private right of action for what are criminal offenses, rape in the first degree, sexual assault in the first degree. And in the normal course, if you're going to pursue a criminal case against someone, you'd be dealing with a proof beyond a reasonable doubt.

THE COURT: But it's not a criminal case. It's a civil case.

MR. BYLER: I know it's a civil case, but you have in question serious questions, as far as I'm concerned, that if you're going to take this over into the civil context with the

1    law providing that you don't need a criminal proceeding in
2    order to bring the cause of action.  And if you're going to
3    bring it over saying you don't even have to, I guess, make a
4    criminal complaint, which is true here, there never was a
5    criminal case pursued, that you're going to say that by a
6    preponderance we're going to hold you liable for money damages
7    for what is, in the penal code, a crime.  I think there's
8    constitutional issues there.  I want to preserve it.  I want to
9    preserve it just by amending my answer to add an affirmative
10   defense, and it's not in terms of a facial attack, but an
11   as-applied attack.
12             THE COURT:  I don't think that this is an affirmative
13   defense.  I think it's an argument with respect to the jury
14   instructions, which you're welcome to make to preserve.  I
15   think it's frivolous.  I would be shocked if you could cite a
16   single authority in support of the argument.  I think, as far
17   as I'm aware and anyone familiar with the OJ Simpson
18   proceedings knows, you can be acquitted of criminal conduct and
19   then sued civilly, and it's a preponderance standard.  I don't
20   know what you're talking about.  Maybe there's authority to
21   support the argument you're making, but I am highly, highly
22   skeptical, and I would beware of making an argument that is
23   frivolous.
24             MR. BYLER:  I understand.  There's not much law under
25   these statutes.

            THE COURT:  Okay.  Well, it's not a question of these statutes, but there is a pretty long history of people being sued civilly for things that constitute criminal conduct.  And if you can't cite a single authority for the proposition that when plaintiff does that it requires a higher burden of proof than the standard preponderance, then I would recommend not making the argument.

            MR. BYLER:  I understand.

            THE COURT:  Don't interrupt me.  I would recommend not making the argument and I would recommend not even bothering to preserve the issue.  But if you feel the need to preserve the issue, you may.  Again, I don't think that involves amending your answer so much as submitting your proposed jury instructions and proposing that the jury should be instructed that it needs to find by clear and convincing evidence or beyond a reasonable doubt and my rejecting that argument, but I'll leave that to you.

            MR. BYLER:  Look, I didn't want any question of fair notice if I raise an issue at that point.  That's what I'm doing.  I'm trying to preserve because, as I said, it's a statute -- these are new statutes, and how they get applied, you know, it's going to be interesting.

            The other request I make is if I have permission to move to amend the answer to add a counterclaim.  And the counterclaim would be the New York Administrative Code, same

1    statute that plaintiff has invoked only, obviously, Steven

2    Kogut claiming a crime of violence on the part of the

3    plaintiff.  And I would request that I be given leave to make

4    that motion and, you know, obviously, they would oppose it, and

5    we have that motion before your Honor at some point in the near

6    future.

7             THE COURT:  What would the good cause be for why you

8    didn't make that --

9             MR. BYLER:  I'm sorry?

10            THE COURT:  What would the good cause be for why you

11   didn't make that motion by the deadline for filing amended

12   pleadings?

13            MR. BYLER:  We have just had document production.

14   We're in the middle of discovery.  I think the standard is

15   leave is freely granted --

16            THE COURT:  No.

17            MR. BYLER:  -- if there's no bad faith here.

18            THE COURT:  No, that's not the standard.  The standard

19   is under Rule 16 it requires a showing of good cause, which

20   requires you to demonstrate due diligence.  My question to you

21   is what is the good cause here?  This is a he said-she said

22   case.  This is not a document case where you needed discovery

23   to understand what your client's view and understanding and

24   experience and story is.  You should have and could have known

25   what his claim was at the time that you filed the answer, and I

1   find it very hard to understand what your possible showing of
2   good cause could be to add a counterclaim at this point in the
3   litigation.
4           MR. BYLER:  If you're not going to allow me to make
5   the motion --
6           THE COURT:  I'm allowing you to tell me what you think
7   the good cause is.
8           MR. BYLER:  I think the good cause is that in
9   discussing with the client what the documents show and having
10  the mediation this morning, quite frankly, hearing out the
11  story, that I have a basis for making that counterclaim where
12  it was not, perhaps to my failing, apparent to us, defense
13  counsel, when the answer was filed much earlier in the case.
14          THE COURT:  All right.  I'll deem that motion made,
15  and it is denied.
16          Now let's talk about discovery because I don't see why
17  I should give you guys any more time.  You have had this
18  schedule -- sorry, you were given four months back in February,
19  and I grudgingly gave you an extension to August 2 and was very
20  clear in the order in which I granted that extension that you
21  would not get any further extensions, which is to say you were
22  on notice.  To the extent you needed to schedule depositions,
23  party or nonparty, you were on notice that you needed to do it.
24          So now I am troubled by the back and forth in your
25  letters.  I am troubled by some of the representations made in

1  those letters.  Quite frankly, Mr. Byler, I am troubled by some
2  of your representations, in particular the claim that you did
3  not know about the scheduled deposition for Mr. Kogut when, by
4  all indications and from the e-mail that you sent, it seems
5  very clear that you did know; and I am not quite sure what to
6  do about that.
7          But the bottom line is I don't know why you guys
8  deserve any more time than you have already been given in this
9  case.  You have had close to six months to complete discovery
10 in a case that is basically a he said-she said kind of case.
11 So as far as I'm concerned, you're going to -- you have a
12 pretty tough road to persuade me you should have any more time
13 than next Tuesday.
14         MR. BYLER:  Remember what you call the scheduled
15 discovery, you were just talking about a wish list mostly of
16 nonparty witnesses for which there would have to be subpoenas
17 served on them.  We're only talking, really, about the
18 deposition of defendant, and we've offered it, you know, a date
19 for that.  And I'd be very glad to work out with Mr. Holzberg
20 mutual dates that are acceptable to us both with respect to the
21 depositions.  I understand that apparently the day I offered
22 wasn't good enough in terms of his own schedule, which I
23 respect.
24         But, you know, I don't know what to tell you other
25 than we are where we are, and I'm basically asking the Court to

give counsel, both sides, the opportunity to do depositions properly in this case. What is done is done. I hear you, but what is done is done. And given the issues and the interest in this case in terms of the application of these statutes, I would request that you do give us more time because, as I said, I think there's more document production that both sides may end up giving each other, and there's the deposition of the parties. And he said-she said, yeah, you look at what other evidence is out there; we have no way of getting nonparty depositions done before August 2. That's where we are right now.

THE COURT: And the fault for that lies squarely with the two of you, not with me.

Let me hear from Mr. Holzberg.

MR. HOLZBERG: Thank you, your Honor.

THE COURT: Into the microphone, please.

MR. HOLZBERG: You got it. Respectfully, your Honor, we noticed depositions for defendant back in May along with several subpoenas for nonparty witnesses. Mr. Byler indicated that he was not accepting, just a few days ago, on behalf of the nonparty witnesses. However, in his 26(a) disclosure statement he listed those witnesses as in care of his firm. To me, that -- I interpreted that to mean that "in care of" means that he would accept on their behalf.

Regardless, we made an attempt, several attempts, in

this case to actually comply with your Honor's orders.  In May, as I mentioned, we sent deposition notices, and Mr. Byler had asked me at that time for an extension.  And in good faith I said, sure, and a joint letter was filed, and your Honor granted it.  And knowing full well of your Honor's order indicating that it was a one-time extension, again, I rather than talking about doing something, I did something, and I noticed the depositions for a second time.  And, obviously, as you read in our letters, they failed to appear.

        THE COURT:  Did you incur any expenses in connection with that?

        MR. HOLZBERG:  I did not end up having a court reporter that day, so there were no real expenses.

        THE COURT:  Okay.  Go on.

        MR. HOLZBERG:  I feel as though I've made every reasonable attempt to comply with your Honor's order, and while Mr. Byler now thinks that -- you know, excluding today, until August 2 we have four days, four business days, to complete these depositions.  I already have depositions scheduled on two other days for other cases.  So to me it's as though I was hoping that your Honor would extend beyond your Honor's word that it was a one-time extension.  I was not willing to take that risk, and I treated it as such.

        I mean, if it's in your Honor's judgment that we would get an extension, then that's -- I see that being the only way

1  possible to complete discovery.  I don't believe that Mr. Byler
2  should have an extension granted based on his previous conduct;
3  but, in all reality, I don't believe that it's possible to
4  complete discovery based on the failure of Mr. Byler to comply
5  with most of the scheduled discovery in this case.
6           THE COURT:  Now, on June 9 of this year, which was 15
7  days before the original deadline for discovery, Mr. Byler
8  submitted a letter in which he stated that there were -- had
9  been and were no discovery disputes that required intervention.
10 You didn't tell me otherwise, and which is to say that with two
11 weeks remaining in discovery at that point and, frankly, no
12 reasonable expectation on your part that you would get any
13 additional time at that point, no one told me that there were
14 any discovery issues.  So this, again, is on the two of you.
15          Now, going back to the subpoenas issue, other than the
16 representations made in the initial disclosures, which I'll ask
17 Mr. Byler about in a moment, what basis did you have to believe
18 that they were authorized to receive subpoenas on the part of
19 the nonparty witnesses?
20          MR. HOLZBERG:  Like your Honor said, the "in care of."
21 The main nonparty witnesses that we had initially sent to
22 Mr. Byler were Mr. Kogut's children.  We figured that that
23 would not be an issue.  It was only after later on did we send
24 the additional subpoenas for the other nonparty witnesses just
25 on the basis that they were listed as in care of his firm.

1          THE COURT:  Did you ever ask if they were authorized
2  to receive those subpoenas?
3          MR. HOLZBERG:  No, your Honor.
4          THE COURT:  In the discussions with either Mr. Byler
5  or his paralegal that are referenced in the letters, were there
6  discussions with respect to the scheduling of the depositions
7  of the children, or was it limited to the scheduling of
8  Mr. Kogut's deposition?
9          MR. HOLZBERG:  Honestly, your Honor, I had no
10 discussion with Mr. Byler as to any schedule.  Mr. Byler's
11 paralegal spoke to my paralegal, and to the best of my
12 understanding, it was that we should schedule something.  There
13 were no proposed dates that I became aware of until just
14 yesterday when I spoke to Mr. Byler's paralegal last night and
15 she indicated two dates over the next four days.  Other than
16 that, I did not receive any proposed dates for any depositions.
17         THE COURT:  What I'm asking, though, is did you
18 receive proposed dates with respect to the depositions of
19 Mr. Kogut's children?  Putting aside the party depositions,
20 what I'm trying to figure out is what representations, if any,
21 were made or what omissions, if any, were made with respect to
22 whether they were authorized to receive those is subpoenas.
23         You served those subpoenas on them by e-mail, as I
24 understand it, on July 11.  And my question is until
25 Mr. Byler's letter to me of the other day, did you have any

1    reason to believe that they were not authorized to receive the
2    subpoenas on behalf of the children?
3             MR. HOLZBERG:  No, your Honor.
4             THE COURT:  What reasons did you have to believe that
5    they were authorized to receive those subpoenas?
6             MR. HOLZBERG:  I had sent the subpoenas back in May,
7    as I indicated, and they did not raise that issue at that time.
8    And as I mentioned, also the "in care of" led me to believe
9    that and their failure to bring it up in May.
10            MR. BYLER:  Your Honor, just real quickly.  Some of
11   the witnesses he subpoenaed --
12            THE COURT:  Mr. Byler.  Mr. Byler, please don't
13   interrupt.  Have a seat, please.
14            MR. BYLER:  Okay.
15            THE COURT:  Thank you.
16            Anything else?
17            MR. HOLZBERG:  No, your Honor.
18            THE COURT:  Okay.  I think part of the problem here is
19   that you guys need to learn how to use a telephone and talk to
20   each other, and it seems clear to me that part of the problem
21   here -- I don't know if it's on the part of the communications
22   within your offices or between your offices, but when you
23   delegate these tasks to paralegals who are not the ones
24   standing up in court, it becomes very difficult to say exactly
25   what happened, and problems arise.  And I would think, given

1   the problems that were very clear -- clearly did arise in
2   connection with the first letter that Mr. Holzberg submitted to
3   me, I am frankly stunned that in the last letter I received
4   from Mr. Byler, you persist in saying our paralegal will talk
5   to their paralegal, and we'll do it that way.  Pick up the
6   phone and talk to each other directly.  It is a very simple way
7   of communicating and avoids a lot of game of telephone and
8   miscommunication.
9            Okay.  Mr. Byler, back to you.  Tell me why I
10  shouldn't permit them to serve the subpoenas on the children
11  and proceed with those depositions given the reasons they had
12  to believe that you were authorized to receive the subpoenas.
13           MR. BYLER:  Well, first of all --
14           MR. HOLZBERG:  Your Honor, sorry.  Excuse me.  If I
15  may, your Honor, explain why there's been no telephone
16  communication, I would be happy to do so.
17           THE COURT:  Fine.  Mr. Byler, have a seat again.
18           Mr. Holzberg.
19           MR. HOLZBERG:  Thank you, your Honor.  Back several
20  months ago, I'll say February/March, I had contacted Mr. Byler
21  over the telephone.  Up to that point, we had an amicable
22  relationship in dealing with each other.  And I tried to
23  express a concern of mine, and Mr. Byler hung up on me.  I
24  didn't bring it to your Honor's attention at that time, but I
25  called Mr. Byler back, and I don't -- I mean, I hate to bring

G7RHDOEC

1     this up, but he was extremely rude, and because of that, I
2     chose from that point forward to speak with his paralegal who
3     has been more than accommodating.  But as far as I'm concerned,
4     the disrespect on behalf of Mr. Byler, I didn't -- I have not
5     really communicated with him unless necessary.
6              THE COURT:  All right.  Well, you should communicate
7     with him because he is your adversary, and if you need to do
8     that in writing by e-mail, that's fine, but you should
9     communicate with him.
10             Mr. Byler, I don't want to --
11             MR. BYLER:  I was just going to say --
12             THE COURT:  I don't want to get into that, but speak
13    to me about the subpoenas.
14             MR. BYLER:  Okay.  The subpoenas were served on a
15    number -- or sent to us identifying a number of witnesses.  The
16    only ones which you could even think about us accepting
17    service, which we had never represented we would, would be the
18    Kogut daughters who are --
19             THE COURT:  That's what I want you to focus on.
20             MR. BYLER:  Because the other individuals --
21             THE COURT:  I want you to focus on the daughters.
22             MR. BYLER:  Okay.  The other individuals, we had no
23    connection.
24             THE COURT:  I want you to focus on the daughters.
25             MR. BYLER:  Okay.  They are of an age where we don't

1  represent them personally; okay?  I always believe that if you
2  were a lawyer and you take a subpoena on behalf of that person,
3  you get authority to do so.  The daughters of Kogut are of an
4  age where they can say, No -- the oldest is 26 -- I'm going to
5  go talk to my in-house lawyer, which is a major company here in
6  New York City.  I don't want you doing anything because talking
7  in this case may affect my employment, wrongly or rightly.

8  Okay.  So I didn't have that authority ever to say we
9  accept.  Now, I didn't, for whatever reason, know about -- I
10 was truthful when I said I didn't know about it till I wrote my
11 second letter, and so it didn't come up before then.  Had it
12 then, you know, it would have been a different way of handling
13 it.  But from the first time that I learned about the subpoena,
14 I said we didn't have authority to accept service on behalf of
15 anybody including, obviously, the Kogut daughters.  And why
16 they were -- we didn't make a fuss about it is I assumed we
17 would work out amicably a deposition schedule, given the time
18 involved in your Honor's current order.  I wasn't going to make
19 a fuss on a technical point, but we were in a situation in
20 which, since the issue was pressed, no, we don't have
21 authority.  I've never spoken to the Kogut daughters to say:
22 May I accept this subpoena?  I would have gone to them and
23 said:  Would you please cooperate and do a deposition on such
24 and such date?  That was my intention.  It was not an intention
25 to frustrate any process.

1    THE COURT:  Okay.  Let me tell you what I'm going to
2  do in stages.  First, you are going to take the depositions of
3  the plaintiff and the defendant in the next few days.  My
4  question is -- you're not leaving until we nail down what days
5  that it's taking place.  Now, as far as I'm concerned, can we
6  do it Friday and Monday?  Any problem with that?  And then we
7  can talk about which one is which.
8    MR. HOLZBERG:  Your Honor, I have a deposition
9  scheduled for Friday and Tuesday, the 4th.  I would be
10 available, I guess --
11   THE COURT:  Tuesday is the 2nd.
12   MR. HOLZBERG:  Sorry.  I apologize.  Yes.  I don't
13 know that I'm -- I'll try to prepare, I guess, for tomorrow.
14 Monday is fine by me.  I would prefer not to do tomorrow if we
15 don't need to, but that pretty much -- I have a deposition on
16 Friday and Tuesday.
17   THE COURT:  Could you defend the deposition tomorrow?
18   MR. HOLZBERG:  I could try, yeah.
19   THE COURT:  All right.  What about you, Mr. Byler, can
20 you take the plaintiff's deposition tomorrow and defend the
21 deposition of defendant on Monday?
22   MR. BYLER:  I can defend Steven Kogut tomorrow.
23   THE COURT:  I'm sorry?
24   MR. BYLER:  I could defend Steven Kogut tomorrow.  I'd
25 like to take the deposition of plaintiff on Monday.  I think

G7RHDOEC

1    that was the proposal I made at some point in the last 24 hours
2    that he could go first with the defendant Kogut, Thursday's
3    fine, Friday's fine, and that I would do the
4    plaintiff's deposition Monday or Tuesday.
5             THE COURT:  Okay.  And he's not free on Tuesday.
6             MR. BYLER:  I understand that.
7             THE COURT:  What about Wednesday?  Are you both free
8    on Wednesday?
9             MR. BYLER:  I'm not good on Wednesday.
10            THE COURT:  Why?
11            MR. BYLER:  I've got another case commitment there.
12   Monday would be fine.
13            THE COURT:  Which is what?
14            MR. BYLER:  In the morning.
15            THE COURT:  Which is what?  What is the commitment?
16            MR. BYLER:  It is a commitment involving a litigation
17   involving property out in Long Island.
18            THE COURT:  What is the commitment?
19            MR. BYLER:  The commitment is to attend part --
20   hopefully, the settlement conference pre-litigation between the
21   parties to what we are litigating over property in Suffolk
22   County Long Island.
23            THE COURT:  Is there a judge involved in that?
24            MR. BYLER:  No.  It's pre-litigation.
25            THE COURT:  So reschedule that.  You're going to do

one deposition on Monday with Mr. Kogut and the
plaintiff's deposition will take place next Wednesday.  I'll
give you a one-day extension of discovery for the purposes of
completing the plaintiff's deposition.  All other discovery
remains to be done by Tuesday with the following exception:  I
personally think that plaintiff had absolutely good faith
reason to believe that the defendant -- that counsel was
authorized to accept subpoenas on behalf of the Kogut
daughters.  I will permit plaintiffs to serve those subpoenas
directly on the Kogut daughters, unless counsel is will to
accept service on their behalf and is authorized to do so, and
to complete those depositions by September 2.

In the meantime, all other deadlines remain in place,
which is to say that all discovery is to be done by Tuesday
with the sole exception of the plaintiff's deposition, which
will take place on Wednesday and the depositions of the
daughters which can go forward at any point prior to
September 2.

The next deadline is the filing of -- I assume no
one's filing for summary judgment in this case.  I can't
imagine summary judgment being granted in this case.  Good.  So
then the joint pretrial order is due on September 6, which is
the day after Labor Day.  I'm not planning to grant any
extensions of that deadline, so plan accordingly.  If you're
away for the week before Labor Day, or what have you, you have

1   to plan with each other, communicate with each other, and make
2   adequate plans to make sure that you file your joint pretrial
3   order and all related things on September 6 or before
4   September 6.  All right.  Look at my individual rules to see
5   precisely what that joint pretrial order means and everything
6   that you are to file by that deadline.
7            Any questions?  Anything else to discuss?
8            MR. HOLZBERG:  No, your Honor.  Thank you.
9            MR. BYLER:  May I get a copy of the transcript?
10           THE COURT:  You're welcome to pay the court reporters
11  and get a copy of the transcript.  That's not my business.
12           Now, I should tell you I have a trial in the GM MDL
13  beginning September 12, so trial will not take place two weeks
14  after you file the joint pretrial order.  But you should be
15  prepared to go to trial as soon as the GM trial is over, and
16  that will take place probably sometime in October, and I'll be
17  in touch with you about that in due course.
18           Thank you very much.  I'll stay on the bench, but the
19  matter is adjourned.
20           MR. HOLZBERG:  Thank you, your Honor.
21           (Adjourned)