**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

JANE DOE,

         Plaintiff,        **15-CV-07726 (SN)**

     -against-          **OPINION AND ORDER**

STEVEN KOGUT,

         Defendant.

-----------------------------------------------------------------X

**SARAH NETBURN, United States Magistrate Judge**:

   On October 26, 2016, the parties participated in a settlement conference before the Court

and reached an oral settlement agreement, the material terms of which were recited on the

record. Before the agreement could be memorialized in a formal written contract, however,

plaintiff indicated that she no longer wished to be represented by the attorney who appeared on

her behalf at the settlement conference, and she obtained new representation thereafter. At a

second conference before the Court on November 30, 2016, plaintiff's new counsel asserted that

the settlement agreement reached on October 26, 2016, was not binding and enforceable because

(1) neither party had been sworn in; (2) plaintiff had not accepted the material terms of the

agreement; and (3) there was a failure of consideration. Defendant subsequently filed a motion to

enforce the October 26, 2016 settlement agreement and for attorney's fees and sanctions against

plaintiff.

   For the reasons set forth below, the defendant's motion to enforce the settlement

agreement is GRANTED but his request for attorney's fees is DENIED. The proposed Order of

Settlement and Judgment is executed and the action is dismissed with prejudice.

# BACKGROUND

## I.     Procedural Background

On September 30, 2015, plaintiff Jane Doe filed a complaint in the United States District Court for the Southern District of New York, alleging she was physically and sexually assaulted and threatened by defendant. Approximately one year later, defendant filed a complaint in New York Supreme Court, alleging, among other claims, a negligent failure to warn and a civil conspiracy to defraud. On October 6, 2016, plaintiff removed defendant's action to the United States District Court for the Southern District of New York. In addition, plaintiff obtained a temporary restraining order in the Family Court of the State of New York, which she has moved to convert to a permanent order. Presumably as a result of a related criminal complaint she filed and that is under consideration with the New York County District Attorney's Office, the petition regarding the restraining order has been transferred to the Integrated Domestic Violence Part.

## II.    Factual Background

### A.  Plaintiff's Allegations

In her September 30, 2015 complaint, plaintiff alleges she suffered physical, emotional, and sexual abuse from defendant beginning in April 2014, shortly after the two began a romantic relationship. According to plaintiff, throughout their relationship, defendant beat, raped, and threatened her, including taking photos of plaintiff with her mouth duct-taped and boasting that he wanted her to suffer. Defendant also told plaintiff that he previously bribed politicians and judges. Occasionally, defendant would ply her with expensive presents and take her on vacations to apologize for the abuse. In July 2014, plaintiff, accompanied by police officers, moved out of defendant's apartment after defendant allegedly shoved her down a flight of stairs. Plaintiff

claims that she continues to suffer severe emotional distress and Post Traumatic Stress Disorder, that defendant has not removed vilifying online content, and that she requires medication and therapy as a result of defendant's conduct. Plaintiff and defendant do not currently reside in the same state.

### B.  Defendant's Allegations

Defendant alleges he was physically assaulted and harassed by plaintiff. On July 16, 2014, defendant claims plaintiff bit and bruised him. The following morning, after a confrontation between defendant's daughter and plaintiff (a domestic incident report of this confrontation was filed by the police), plaintiff returned to defendant's apartment with police officers to retrieve her belongings. Defendant made clear to plaintiff that she was not to return to the apartment unless she was accompanied by the police. Defendant alleged that two days later, plaintiff entered his apartment without permission. Plaintiff was then arrested and charged with assault in the third-degree and harassment in the second-degree and a second domestic incident report was filed.

Defendant also alleges defamation as a result of various unflattering articles published in the New York Post. Specifically, defendant claims plaintiff provided the New York Post false information about him, including his wanting plaintiff to suffer "like Hitler made people suffer" and bragging he had the police on his side. Am. Compl. ¶ 23. Because this information was circulated in a well-known publication, defendant believes he has been exposed to public ridicule, his current business relationships have been damaged, and future investment opportunities have been lost.

Finally, according to defendant, plaintiff engaged in racketeering activity centered on fraudulent charity organizations and schemes. After plaintiff moved into his apartment in May

2014, he began probing into her charity endeavors and discovered that she was embezzling donations and had created a shell nonprofit organization to generate funding. He also claims that plaintiff gloated of extorting a previous boyfriend and believes that he has been a victim of extortion as well.

### C. October 26, 2016 Settlement Conference and Agreement

#### 1. The Settlement Conference[1]

The Court held a settlement conference on October 26, 2016 (the "October 26 conference"). Both plaintiff and defendant were represented by counsel—Paul J. Campson of Campson and Campson, and Christopher Scott Joslin of David Horowitz P.C., respectively. I spoke separately with plaintiff and defendant multiple times, conveying each party's position. After approximately five and a half hours of facilitated negotiation, the parties indicated they would accept the negotiated terms and settle the case. I then asked the parties to convene in the courtroom to place the terms of the settlement agreement and the parties' consent to those terms on the record.

Once the parties were in the courtroom, I entered the terms of the settlement agreement into the record. At the outset, I stated, "I want to make sure that each party understands the terms of the settlement agreement, that each party accepts the terms of the settlement agreement, and that each party understands that he or she will be entering into a binding and enforceable oral agreement today." Oct. 26, 2016 Tr. at 3:5-9. I emphasized that "we are entering into a contract today." Id. at 3:10. Next, I acknowledged the parties' intent to memorialize the oral agreement in writing after the settlement conference and explained that the written result would reflect the material terms. I did not state that a term of the agreement was that it be memorialized in a

---

[1] The parties had appeared before the Court for a previous settlement conference on July 27, 2016, which was unsuccessful.

written document before anyone would be bound the settlement terms. No one expressly reserved the right not to be bound before an agreement would be enforceable.

I then recited the following terms of the agreement. First, defendant would pay plaintiff $10,000 within 30 days from the execution of the written settlement agreement, which I had envisioned would happen within the following two weeks. Second, plaintiff's and defendant's claims would be dismissed with prejudice. Third, there would be "mutual general releases of all claims that were known or unknown based on any facts from the beginning of time to today's date, October 26th." Oct. 26, 2016 Tr. at 4:24-5:1. Fourth, under a mutual non-disparagement requirement, both parties would not speak unfavorably about the other. Fifth, the settlement agreement would be confidential. Sixth, the plaintiff would withdraw both her complaint in the criminal proceeding (with the understanding that the case could still go forward in the prosecution's discretion), and her petition in Family Court to convert the temporary restraining order into a permanent restraining order. I directed plaintiff's counsel to withdraw the Family Court petition by November 10, 2016, and to copy defense counsel on his application to withdraw. Seventh, there would be a mutual stay away provision—the parties, in perpetuity, would refrain from purposefully engaging in acts or conduct that might lead to interaction, including both physical and virtual conduct. Finally, the parties would remove any reference to the opposing party on any websites they controlled and notify opposing counsel as to when the information would be withdrawn.

In addition to these material terms, the Court and the parties discussed, on the record, the method by which defendant would transfer the settlement amount to plaintiff. I also stated that once the oral settlement agreement was reduced to a writing and the parties consented to my

jurisdiction for all purposes, I would "promptly dismiss both cases with prejudice but with leave to reopen within 30 days." Oct. 26, 2016 Tr. at 7:23-8:2.

I then provided the parties with an opportunity to ask questions or raise issues about any of the recited terms. Aside from defense counsel's request for clarification regarding the form of payment, no questions or statements were made by any party. I asked both parties to affirm that they understood the terms of the agreement I had just recited and that they agreed to be bound by the settlement agreement as recited on the record. I began with plaintiff, who stated she understood the terms. When I asked whether she accepted the terms, the following exchange occurred:

THE COURT: Do you accept these terms? Do you accept these terms of the settlement agreement?

MR. KOGUT: Yes, Your Honor.

THE COURT: No, no. Sorry. Let me -- I'm speaking just to the plaintiff right now.

MS. DOE: He's harassing me while I'm here.

THE COURT: He's not harassing you. He misunderstood what was happening. Do you understand the terms of the settlement agreement?

MS. DOE: Yes, Your Honor.

THE COURT: Do you accept these terms?

MS. DOE: I prefer it to go forward and let him win. Yes.

THE COURT: That's not an answer I can accept. So you have two choices.

MS. DOE: Yes.

THE COURT: The answer is either yes or no. So I need a –

MS. DOE: The answer is yes, Your Honor. Thank you.

THE COURT: Are you accepting these terms voluntarily?

MS. DOE: Yes, Your Honor.

THE COURT: Do you understand the terms of the settlement agreement?

MS. DOE: Yes, Your Honor.

THE COURT: Do you understand that by accepting these terms you are entering into a binding and enforceable oral contract right now?

MS. DOE: Yes, Your Honor.

Oct. 26, 2016 Tr. at 9:20-10:24. Defendant then declared he understood and accepted the terms of the agreement. At the close of the allocution, I confirmed, "We have now entered into a binding and enforceable oral agreement." Id. at 10:10-11. No one objected.

At the conclusion of the settlement conference, after I left the courtroom, the parties executed a Notice, Consent, and Reference of a Civil Action to a Magistrate Judge form, agreeing to my jurisdiction for all purposes, including any subsequent motion to enforce the settlement agreement or address a breach. See ECF No. 94.

**D. Withdrawal of Plaintiff's Counsel**

On November 2, 2016, plaintiff's then-attorney Mr. Campson informed the Court that plaintiff wanted to terminate his representation. See ECF No. 95. In his November 9, 2016 letter, Mr. Campson formally moved to withdraw as plaintiff's counsel, explaining that plaintiff had "indicated a lack of trust in my representation." ECF No. 99. In addition, Mr. Campson believed he lacked the authority to withdraw the pending Family Court petition "as agreed upon as my client appears to be reconsidering that as well as the entire settlement." Id.

The Court scheduled a status conference for November 16, 2016. See ECF No. 100. The day of the conference, however, Paul Verner of Verner Simon (identifying himself as plaintiff's

new counsel) submitted an emergency motion to adjourn the conference in order to finalize his

retention. See ECF No. 102. He confirmed that the plaintiff would "not finalize the settlement

discussed on October 26, 2016." Id. To give Mr. Verner more time to review the case, the Court

adjourned the conference to November 30, 2016.

### E.  November 30, 2016 Conference

On November 30, 2016, the parties appeared again before the Court, with both Mr.

Campson and Mr. Verner in attendance. Mr. Verner argued that the settlement agreement was

void, given that the parties had not been sworn in at the time and that neither the settlement

agreement nor the settlement payment had been provided to plaintiff. Mr. Verner also asserted

that, based on his review of the October 26 conference transcript, that plaintiff was under duress

and felt pressured to settle. He cited plaintiff's statement, "I prefer it to go forward and let him

win," to show that she "felt compelled and pressured to say yes when, in the first instance in her

response, she wavered when you asked her whether she agreed." Nov. 30, 2016 Tr. at 3:20, 5:12-

15; see also 9:25-10:2 ("As I said, there is an indicia of duress that the Doe plaintiff was

suffering from during the settlement proceeding. I don't know whether the Court was made

cognizant of it."). Mr. Verner acknowledged, however, the considerable amount of time I had

spent with plaintiff on October 26, 2016, in separate negotiations before the settlement

agreement was placed on the record. At the close of the conference, defense counsel moved to

enforce the settlement agreement that was entered into on October 26. The Court issued a

briefing schedule for defendant's motion to enforce the agreement.

### DISCUSSION

The central question is whether the parties reached an enforceable oral agreement to

settle this case at the October 26, 2016 conference. The Court applies the body of law governing

the enforceability of oral settlement agreements. See Powell v. Omnicom, 497 F.3d 124, 128–31 (2d Cir. 2007).

## I.        Governing Law

Parties in this Circuit may "enter into binding oral agreements." Figueroa v. N.Y. City Dep't of Sanitation, 475 F. App'x 365, 366–67 (2d Cir. 2012) (citing Winston v. Mediafare Entm't Corp., 777 F.2d 78, 80 (2d Cir. 1985)); see also Mtgs. & Exp'tns Inc. v. Tandy Corp., 490 F.2d 714, 717 (2d Cir. 1974) (internal citations and quotation marks omitted). This principle applies in equal force to settlement agreements. See Powell, 407 F.3d at 128 ("When a party makes a deliberate, strategic choice to settle, a court cannot relieve him of that choice simply because his assessment of the consequences was incorrect."); Foster v. City of N.Y., No. 96 Civ. 9271 (PKL), 2000 WL 145927, at *4 (S.D.N.Y. Feb. 7, 2000) ("This court must enforce a binding oral agreement, notwithstanding that plaintiff may have had a change of heart."); Willgerodt v. Hohri, 953 F. Supp. 557, 560 (S.D.N.Y. 1997).

The lynchpin of any settlement agreement is the mutual assent of parties to the terms of the settlement. See Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004) (a party "cannot be held to have contracted if there was no assent or acceptance"). Parties may enter and be bound by an agreement without signing a fully executed contract. See, e.g., Winston, 777 F.2d at 80; Bonnette v. Long Island Coll. Hosp., 3 N.Y.3d 281 (2004) (a settlement agreement that has not been reduced to writing may still be enforced). Where there is no signed, written document on which to rely, the controlling factor in determining whether parties are bound by an agreement is whether a court has evidence of the parties' intent to be bound. See, e.g., Powell, 497 F.3d at 129; Winston, 777 F.2d at 80 (parties have the "freedom to determine the exact point at which an agreement becomes binding, a party can negotiate candidly, secure in the knowledge

that he will not be bound until execution of what *both* parties consider to be a final document" (emphasis added)). Because a court cannot glean the "secret or subjective intent" of the parties, "it is the objective intent . . . that controls." Klos v. Polski Linie Lotnicze, 133 F.3d 164, 168 (2d Cir. 1997).

 This matter has come before the Court on the basis of diversity jurisdiction, relying on New York law. The plaintiff asserts that New York Civil Practice Law and Rules 2104 ("Rule 2104") is inapplicable to a diversity action. Rule 2104 provides:

> An agreement between parties or their attorneys relating to any matter in an action, *other than one made between counsel in open court*, is not binding on a party unless it is in a writing subscribed by him or his attorney or reduced to the form of an order and entered.

N.Y. CPLR R. 2104 (emphasis added). The court in Figueroa held that in the context of federal question jurisdiction, the "the question of whether federal or state law controls the enforceability of a settlement agreement in this context is an open one" but did not discuss whether choice of law was also an open question for purposes of a diversity claim. Figueroa, 475 F. App'x at 366 (citing Ciaramella v. Reader's Digest Ass'n, 131 F.3d 320, 322 n.1 (2d Cir. 1997)). In this Circuit, courts apply New York law in diversity cases, but observe that "there is no meaningful substantive difference between federal and New York law with regard to [settlement] enforceability." Massie v. Metro. Museum of Art, 651 F. Supp. 2d 88, 92–93 (S.D.N.Y. 2009). Accordingly, under either New York or federal law, an oral settlement will be binding if it was made "in open court," that is, if it was formally memorialized in some way in the court's record. See U.S. Fire Ins. Co. v. Pierson & Smith, Inc., No. 06 Civ. 382 (CM)(LMS), 2007 WL 4403545, at *3 (S.D.N.Y. Dec. 17, 2007); see also Monaghan v. SZS 33 Assoc., L.P., 73 F.3d 1276, 1283 n.3 (2d Cir. 1996) ("[T]he federal rule regarding oral stipulations does not differ

significantly from the New York rule."); In re Dolgin Eldert Corp., 31 N.Y.2d 1, 9–10 (1972) (citing N.Y. CPLR R. 2104).

## II.   Whether a Binding Agreement Was Executed at the October 26 Settlement Conference

Applying New York law, the Court considers the four-factor test set out in Winston to determine whether the October 26, 2016 oral settlement agreement is enforceable: whether (1) there has been an express reservation of the right not to be bound in the absence of a writing; (2) there has been partial performance of the contract; (3) all of the terms of the alleged contract have been agreed upon; and (4) the agreement at issue is the type of contract that is usually committed to writing. See Winston, 777 F.2d at 80; Guardian Life Ins. Co. of Am. v. Calkins, No. 12 Civ. 8863 (JGK), 2014 WL 61475, at *2 & n.1 (S.D.N.Y. Jan. 6, 2014) (applying the Winston factors on the basis that "Winston was decided under New York law"). These factors "may be shown by oral testimony or by correspondence or other preliminary or partially complete writings." Winston, 777 F.2d at 81 (internal quotation omitted). Although no single factor is dispositive, each factor provides significant guidance. See Ciaramella, 131 F.3d at 323. The factors must be considered in light of the entire context of the case, bearing in mind that the parties' intent ultimately controls. See Winston, 777 F.2d at 81.

### A.  Express Reservation

The first Winston factor looks to whether each party expressly reserved the right not to be bound by the agreement before a written document is executed. A reservation of this right is entitled to great weight. See Kaczmarcysk v. Dutton, 414 F. App'x 354, 355 (2d Cir. 2011) (although no single Winston factor is dispositive, "where there is a writing between the parties showing that [one party] did not intend to be bound," a court "need look no further than the first factor" (internal citation and quotation marks omitted)); Nieves v. Cmty. Choice Health Plan of

11

Westchester, Inc., No. 08 Civ. 0321 (VB)(PED), 2011 WL 5533328, at *4 (S.D.N.Y. Aug. 31, 2011). Under New York law, a party's intent to reserve the right not to be bound in the absence of a writing is shown objectively by "forthright, reasonable signals that it means to be bound only by a written agreement." Jordan Panel Sys., Corp. v. Turner Const. Co., 841 N.Y.S.2d 561, 565 (1st Dep't 2007) (internal citation and quotation marks omitted); see also Ciaramella, 131 F.3d at 324 (analyzing the "express reservation" factor by determining whether there are "indications in the proposed settlement agreement that the parties did not intend to bind themselves until the settlement had been signed").

Courts also analyze "whether the particular facts and circumstances of the case" establish an implied reservation not to be bound until a written agreement has been executed. Lindner v. Am. Exp. Corp., No. 06 Civ. 3834 (JGK), 2007 WL 1623119, at *6 (S.D.N.Y. June 5, 2007) (finding such an implied reservation where plaintiff's counsel stated on the record twice that he reserved the right to modify any written settlement language and where the draft agreement contained both a merger clause and a clause allowing the plaintiff to revoke the agreement within seven days of signing).

The parties neither impliedly nor expressly reserved the right not to be bound at the October 26, 2016 settlement conference. There were no "forthright, reasonable" or "objective signals" at the conference suggesting that the parties did not intend to bind themselves until after the settlement was memorialized. Jordan Panel Sys., Corp., 841 N.Y.S.2d at 565. I stated explicitly, "I want to make sure . . .  that each party understands that he or she will be entering into a binding and enforceable oral agreement today, which means that we are entering into a contract today." Oct. 26, 2016 Tr. at 3:5-10. Neither party's counsel reserved the right to modify the written settlement language at a later date or argued that a clause allowing for revocation

should be added. In addition, neither party made any objection after I read out the material terms. Indeed, both parties affirmed their understanding of the material terms.

I further stated, "Within 30 days I have every expectation that the parties will have executed the settlement agreement." Id. at 3:18-19. Plaintiff asserts in her opposition that Mr. Campson understood my statement to mean the parties would have a 30-day "cooling off" period during which plaintiff would have the right to rescind the agreement. Pl.'s Mem. in Opp. at 4 (ECF No. 118). But plaintiff fails to include any affirmation by Mr. Campson confirming this interpretation. Moreover, the reference to 30 days was in the context of my express intention to dismiss the case immediately upon transfer of jurisdiction to me with leave to reopen in 30 days if any issues arose in the drafting of the settlement agreement. In fact, I later stated, "[T]he parties are consenting to my jurisdiction for all purposes. I understand that the settlement agreement will provide that I retain jurisdiction over this case. Once the case has been reassigned to me I will promptly dismiss both cases with prejudice but with leave to reopen within 30 days." Oct. 26, 2016 Tr. at 7:23-8:2. Nothing in the record suggests that the 30 days was intended to as additional time for the parties to decide whether or not to revoke the settlement agreement. Indeed, Mr. Campson's interpretation, as relayed by plaintiff, is directly at odds with my repeated reminders to the parties at the October 26 conference that they were entering into a binding and enforceable contract right then and there. In sum, the first Winston factor militates strongly in favor of enforcing the settlement agreement.

### B.  Partial Performance

The second Winston factor is "whether one party has partially performed, and that performance has been accepted by the party disclaiming the existence of an agreement." Ciaramella, 131 F.3d at 325; R.G. Grp., Inc. v. Horn & Hardart Co., 751 F.2d 69, 75–76 (2d Cir.

1984) ("Partial performance is an unmistakable signal that one party believes that there is a contract; and the party who accepts the performance signals, by that act, that it also understands a contract to be in effect."); Nieves v. Cmty. Choice Health Plan of Westchester, Inc., No. 08 Civ. 321 (VB)(PED), 2011 WL 5531018, at *6 (S.D.N.Y. Nov. 14, 2011) (partial performance requires some actual performance, such that one party has conferred something of value upon the other party, which the other party then accepts).

Defense counsel represents that he ordered the court minutes and began to draft the written agreement. Defendant also points out that, following the conference, the depositions of defendants' two daughters and plaintiff's psychologist were stayed and the litigation was suspended. Plaintiff, however, contends that no partial performance took place because (1) a fully drafted and executed settlement agreement was not tendered to plaintiff and (2) no consideration exchanged hands.

Defense counsel's ordering of the minutes and preliminary drafting of the settlement agreement does not constitute partial performance. See Langreich v. Gruenbaum, 775 F. Supp. 2d 630, 636 (S.D.N.Y. 2011) (rejecting argument that drafting agreement constituted partial performance); Lyman v. New York and Presbyterian Hosp., No. 11 Civ. 3889 (AJN)(JCF), 2012 WL 6135354, at *7–8 (S.D.N.Y. Dec. 11, 2012) (exchanging draft settlement agreements did not constitute partial performance where the writing itself was not an agreed-upon term).

But this lack of partial performance is owed directly to the withdrawal of plaintiff's former counsel. The cases cited by plaintiff finding an absence of partial performance involved an attorney withdrawing *after* a settlement agreement was drafted and exchanged, whereas Mr. Campson withdrew *before* a written settlement agreement was completed and sent to plaintiff. Any further performance in connection with settlement ground to a halt when Mr. Campson

notified defendant and the Court on November 2, 2016 (six days after the settlement conference),

that he would be withdrawing as counsel. Mr. Campson's subsequent letter on November 9,

2016, further confirmed that plaintiff was "reconsidering . . . the entire settlement," and that he

lacked the authority to withdraw the Family Court petition "as agreed upon" on October 26. ECF

No. 99. Furthermore, Mr. Verner did not submit a letter until November 16, 2016, identifying

himself as plaintiff's new counsel and asserting that "the plaintiff intends to proceed forward to

trial in this matter and will not finalize the settlement discussed on October 26, 2016." ECF No.

102. A status conference originally scheduled for November 16, 2016, was then adjourned to

November 30, 2016, to give Mr. Verner more time to familiarize himself with the case. See ECF

No. 103. Accordingly, it would have been unreasonable for defense counsel to complete and

submit the settlement agreement to either Mr. Campson, who was no longer representing

plaintiff, or Mr. Verner, who, per plaintiff's instructions, would not have executed any

settlement. Plaintiff also notes that defense counsel failed to tender the payment of $10,000. That

payment, however, was contingent on "execution of the settlement agreement," which became

impossible to perform by virtue of the letters submitted shortly after the settlement conference.

Oct. 26, 2016 Tr. at 3:24-4:2.

 Therefore, because the lack of partial performance was caused by the withdrawal of

plaintiff's former counsel, this factor does not tip the balance in either direction.

### C.  Existence of Open Terms

 The third Winston factor examines whether the parties agreed on all material terms. See

Ciaramella, 131 F.3d at 325 (there can be no fully formed, binding contract where material terms

remain to be negotiated); Teachers Ins. and Annuity Ass'n of Am. v. Tribune Co., 670 F. Supp.

491, 499 (S.D.N.Y. 1987) ("There is a strong presumption against finding binding obligation in

agreements which include open terms, call for future approvals and expressly anticipate future participation and execution of contract documents."). The agreement reached on October 26, 2016 was comprehensive—a mutual dismissal of all claims, a mutual removal of all relevant online content, and plaintiff's withdrawal of the petition pending in Family Court in exchange for $10,000. Another term was that the parties would consent to my jurisdiction and that I would retain that jurisdiction for purposes of any enforcement action. This term was fulfilled when, after the settlement conference concluded and the agreement was placed on the record, the parties executed the Consent form, which Judge Furman signed, and the case was transferred to me for all purposes.

After I recited the material terms, I asked each party's counsel whether there was any term I omitted. See Oct. 26, 2016 Tr. at 8:15-17. Mr. Campson replied in the negative. See id. at 8:18. Defense counsel requested clarification as to the form of the check to be made out to plaintiff but indicated that it was not a material term. See id. at 8:19-9:4.

Plaintiff argues that at least one material term was left unresolved—the withdrawal of the Family Court petition. The Court had set November 10, 2016, as the deadline for plaintiff to withdraw her petition and to provide defendant with the notice of withdrawal. See Oct. 26, 2016 Tr. at 6:10-15. In Mr. Verner's November 17, 2016 letter, he informed the Court that the Family Court proceeding was adjourned because of the court's *sua sponte* transfer of the petition to the Integrated Domestic Violence Part of the New York Supreme Court. See ECF No. 105. According to plaintiff, this "intervention of the criminal court system" meant that not all terms of the settlement agreement could be agreed upon. Pl.'s Mem. in Opp. at 6 (ECF No. 118). But during the October 26, 2016 conference, the parties had already acknowledged and accepted this "intervention of the criminal court system" by agreeing to proceed with settlement

notwithstanding plaintiff's complaint pending in criminal court. Defense counsel specifically recognized that plaintiff might not be able to withdraw her complaint in criminal court "because the People retain the ultimate decision as to whether they're going to prosecute those claims or not." Oct. 26, 2016 Tr. at 5:19-6:2. In other words, the parties treated the pending criminal proceedings as a matter outside of plaintiff's control and chose to continue with the settlement discussion. Therefore, the two outstanding proceedings (including the now-transferred petition for a restraining order) should not now be construed as open items. This factor thus favors finding the agreement enforceable.

### D.  Usually Committed to a Writing

The final Winston factor considers whether the purported agreement is the type of contract that is generally reduced to writing in New York. To determine whether the agreement is one normally reduced to writing, the Court is guided by Rule 2104, which, as previously discussed, governs whether a writing is required under New York law. See Silas v. City of New York, 536 F. Supp. 2d 353, 359 (S.D.N.Y. 2008); Clark v. Gotham Lasik, PLLC, No. 11 Civ. 1307, 2012 WL 987476, at *5 (S.D.N.Y. Mar. 2, 2012) ("[E]ven if [Rule] 2104 is not controlling, it is relevant to the fourth Winston factor: it illustrates that the settlement agreement here is of the type usually committed to writing." (internal citation and quotation marks omitted)).

Initially after Winston, the Court of Appeals for the Second Circuit evaluated the fourth factor primarily by assessing the complexity of the transaction and whether the settlement terms applied in perpetuity. See Winston, 777 F.2d at 83 (a settlement agreement with a payment plan spanning several years was sufficiently complex to require a writing); Ciaramella, 131 F.3d at 326 (a settlement agreement containing terms applying in perpetuity required a writing). But the

fact that some of the material terms recited at the October 26 conference apply in perpetuity is not dispositive, given that courts in more recent cases have turned to the complexity of a transaction *after* determining that the agreement was not recited on the record. See, e.g., Adjustre Sys., Inc. v. GAB Bus. Servs., Inc., 145 F.3d 543, 551 (2d Cir. 1998); U.S. v. U.S. Currency in the Sum of Six Hundred Sixty Thousand, Two Hundred Dollars, 423 F. Supp. 2d 14, 30–31 (E.D.N.Y. 2006); Hostcentric Tech., Inc. v. Republic Thunderbolt, LLC, No. 04 Civ. 1621 (KMW)(AJP), 2005 WL 1377853, at *9 (S.D.N.Y. June 9, 2005); Conway v. Brooklyn Union Gas Co., 236 F. Supp. 2d 241, 251–52 (E.D.N.Y. 2002).

The analogy of open-court oral agreements made on the record to an actual writing is rooted in Rule 2104. As discussed above, under Rule 2104, an oral settlement agreement is only binding if it is made in "open court." Willgerodt, 953 F. Supp. at 560; see also Powell, 497 F.3d at 129 (the open court requirement "serves as a limited exception to the Statute of Frauds" (internal citation and quotation marks omitted)); Monaghan v. SZS 33 Assocs., L.P., 73 F.3d 1276, 1283 (2d Cir. 1996); In re Dolgin Eldert Corp., 31 N.Y.2d at 8–10. "Open court" refers to "the formalities attendant upon documenting the fact of the stipulation and its terms." Popovic v. N.Y.C. Health and Hosp. Corp., 579 N.Y.S.2d 399, 400 (1st Dep't 1992). In other words, the importance of the "open court" requirement is to ensure that there are "some formal entries, if only in the clerk's minutes, to memorialize the critical litigation events." Dolgin, 31 N.Y.2d at 10. A transcript of a proceeding is sufficient to satisfy Rule 2104. See, e.g., Alvarez, 146 F. Supp. 2d at 337; Monaghan v. SZS 33 Assocs., L.P., 875 F. Supp. 1037, 1042 (S.D.N.Y. 1995).

The terms of the settlement agreement were read into the record and agreed to at the October 26, 2016 conference. Plaintiff was represented by counsel at the settlement conference, implicating none of the concerns of applying Rule 2104 that would have arisen had she

proceeded pro se. Plaintiff's new counsel, however, asserts that the parties were not sworn in. But other metrics of formality, as required by Rule 2104's "open court," were satisfied: the material terms of the settlement agreement were read into the record, the parties were each required to affirm their understanding of the binding nature of the agreement and the significance of the material terms, and a complete transcript documenting the oral agreement was generated afterwards.

In light of these facts, the Court finds that the fourth <u>Winston</u> factor militates in favor of finding the settlement agreement to be enforceable.

### E.  Conclusion of <u>Winston</u> Analysis

Three of the four <u>Winston</u> factors strongly weigh in favor of enforcement. Most important to the Court's analysis, the record shows the parties' intent at the settlement conference to enter a binding oral settlement agreement. <u>See</u> <u>Milner v. City of N.Y. et al.</u>, No. 10 Civ. 9384 (JGK)(GWG), 2012 WL 3138110, at *5 (S.D.N.Y. Aug. 2, 2012) ("Critically, and far more important than any of the <u>Winston</u> factors, the parties made clear at the time of the settlement that they viewed it to be binding"); <u>Medinol Ltd. v. Guidant Corp.</u>, 500 F. Supp. 2d 345, 353 (S.D.N.Y. 2007) ("A settlement stated on the record is one of the strongest and most binding agreements in the field of the law and is thus entitled to substantial deference." (internal citation and quotation marks omitted)).

The Court thus finds that the parties entered into an enforceable settlement agreement as stated in the transcript of the October 26 settlement conference.

### III.  Plaintiff's Assertion of Duress

Aside from evaluating the settlement agreement under <u>Winston</u>, the Court must also address plaintiff's claim that she was under duress throughout the October 26 settlement

conference, and that she should now be released from any statements of assent she made to the settlement. To avoid the enforcement of an agreement on the basis of duress, a party must demonstrate that a wrongful threat precluded the exercise of free will and caused her involuntarily to accept the terms of the agreement. See Figueroa v. City of N.Y., No. 05 Civ. 9594 (JGK), 2011 WL 309061, at *3 (S.D.N.Y. Feb. 1, 2011). Specifically, the party "must show: (1) a threat, (2) unlawfully made, (3) which caused involuntary acceptance of contractual terms, (4) because the circumstances permitted no alternative." Raghavendra v. Trs. of Columbia Univ., 686 F. Supp. 2d 332, 342 (S.D.N.Y. 2009) (internal citation and quotation marks omitted); see also Kamerman v. Steinberg, 891 F.2d 424, 431 (2d Cir. 1989); Mathias v. Jacobs, 167 F. Supp. 2d 606, 614 (S.D.N.Y. 2011); Juhasz v. N.Y.C. Transit Auth., 49 A.D.2d 730, 730–31 (1st Dep't 1975) (a court may not set aside a settlement agreement where allegations of duress are not substantiated by the record).

Plaintiff's allegations of (1) defendant's threat of bringing charges of tax evasion (which was allegedly conveyed by the Court), (2) Mr. Campson's inadequate representation during the settlement conference, and (3) the previous day's psychiatric examination and sensitive nature of the underlying claims do not rise to the level of duress. Addressing plaintiff's most serious allegation first, she is "99.9% sure" that, at some point during the settlement negotiations, I conveyed to her defendant's threat that if she refused to settle, he would make sure she would be charged with tax evasion. Pl.'s Decl. in Opp. ¶ 33 n.7 (ECF No. 119). First, I do not recall conveying such a threat and would not have done so. To the extent I conveyed the defendant's consideration of introducing plaintiff's tax returns to attack her credibility at trial, it was consistent with my duties to advise both parties of all the risks of foregoing settlement. To be sure, any discussion I had with the plaintiff regarding her potential tax exposure was fleeting.

Second, plaintiff has not raised sufficient facts to support a finding that she was compelled to agree to the settlement terms as a result of this purported threat. Mr. Campson would have heard this alleged threat being conveyed because he was present during all of my communications with plaintiff. Yet, this particular allegation is uncorroborated by any sworn statements by Mr. Campson. Mr. Verner's Declaration refers to a telephone call he had with Mr. Campson on November 16, 2016, in which they discussed Mr. Campson's interpretation of the 30 day period as a "cooling off period." Paul M. Verner's Decl. in Opp. ¶¶ 3–4 (ECF No. 120). Had he in fact heard a threat of this magnitude conveyed to his client by a federal judge, Mr. Campson would have certainly informed Mr. Verner, who then should have addressed the threat in his own Declaration or sought to obtain an affirmation attesting as much from Mr. Campson. As it stands, this threat is raised in only plaintiff's Declaration. Even so, notwithstanding this alleged threat, plaintiff proceeded with settlement negotiations and affirmed her understanding and acceptance of the agreement with counsel by her side. She stated on the record that she accepted the terms voluntarily. See Oct. 26, 2016 Tr. at 10:15-17. At no time did she suggest, expressly or impliedly that she was settling under duress cause by some threat.

Third, plaintiff argues that her statement during the allocution, "I prefer it to go forward and let him win," demonstrated her inability to enter into the settlement agreement because she felt "scared, defeated, abandoned, unpresented" at the time. Pl.'s Decl. in Opp. ¶ 38 (ECF No. 119).[2] During the *ex parte* discussions, the plaintiff had, at times, adopted a defeatist attitude. For example, she would say that she was "lucky" to have her limbs intact and suggest sarcastically

---

[2] Plaintiff swears under the penalty of perjury that the transcript is not correct and that her actual statement was "I'd prefer it to go forward [rather than] let him win." Pl's Decl. in Opp. ¶ 37 (ECF No. 119). I have a very clear memory of this moment and plaintiff's recollection is wrong. Plaintiff's version of the statement is materially different. Had she made such a statement, the Court would have ended the allocution and deemed the settlement efforts failed.

that she should be "grateful" for the small sums of money defendant was offering. At the time of her comment in open court, I interpreted her preference to have "it" – the settlement – go forward and "let him win" as consistent with her prior attitude of resignation. (Consistent with this understanding, the plaintiff continued her response to me and said "Yes" in answering my question "Do you accept these terms?") Indeed, the plaintiff had the opportunity to assert at that very moment that she did not want to proceed. I rejected her response and said, "you have two choices . . . The answer is either yes or no." Id. at 10:9-12. The plaintiff indicated not once but twice that she was accepting the settlement terms. I clarified whether she was accepting the terms "voluntarily." Id. at 10:15-17. The plaintiff affirmed that she did accept voluntarily and that by accepting, she was entering into a binding and enforceable oral contract.

Plaintiff's other allegations do not rise to the level of duress. Plaintiff alleges that Mr. Campson was not as familiar or as up to speed with her claims as her previous attorney was. See Pl.'s Decl. in Opp. ¶ 30 (ECF No. 119) ("At the settlement conference, it was very clear that Mr. Campson simply did not know my case."). But an attorney's relative unfamiliarity with a case does not constitute the type of "unlawful threat" necessary to support a claim of duress and is not a basis for refusing to enforce a settlement agreement. See Raghavendra, 686 F. Supp. 2d at 344 (general "dissatisfaction or disagreement with counsel during settlement negotiations did not constitute duress," even where plaintiff was "brow-beaten" and "shouted down" by her attorney during settlement negotiations). Plaintiff further maintains that she was "sequestered in a separate room and would be visited by Gary Small, Campson and Magistrate Netburn." Pl.'s Decl. in Opp. ¶ 32 (ECF No. 119). This is a completely false impression. She was by no means merely "visited" by her counsel and otherwise isolated. Plaintiff was in the same room as her

lawyer and a friend for almost the entire settlement conference, other than a two-minute private conversation between me and her counsel at counsel's request.

In addition, there is no evidence that plaintiff's mental state at the time caused her to lack contractual capacity or that her affirmation of the terms was the result of impulsive or irrational behavior beyond her control. See Willgerodt, 953 F. Supp. at 560 (rejecting a party's effort to rescind the settlement agreement because of an absence of evidence as to how "a combination of mental fatigue, depression, confusion, fear and intimidation" would cause her to lack contractual capacity). Nor is there evidence to show she failed to raise objections because she was confused, under shock or under time pressure (given that settlement negotiations spanned five and a half hours) to settle. See Massie, 651 F. Supp. 2d at 95.

Accordingly, because three of the four Winston factors strongly favor enforcement of the settlement agreement and there is no finding of duress, defendant's motion to enforce the settlement agreement is GRANTED.

## IV.    Motion for Attorney's Fees

Defendant seeks a sanction of attorney's fees and costs incurred in connection with filing this motion to enforce the settlement agreement, given plaintiff's "bad faith" in "unilaterally reneging on the settlement agreement without cause or justification." Df.'s Mem. of Law at 11–12 (ECF No. 113).

"There is no general rule that attorney's fees should be awarded on a successful motion to enforce a settlement agreement." Torres v. Costich, 935 F. Supp. 2d 232, 236 (W.D.N.Y. 1996); see also Hostcentric Tech. Inc. v. Republic Thunderbolt, LLC, No. 14 Civ. 1621 (KMW)(AJP), 2005 WL 1377853, at *10 (S.D.N.Y. June 9, 2005); Francis v. Home Box Office, No. 04 Civ. 7430 (DLC), 2005 WL 1020863, at *4 (S.D.N.Y. Apr. 28, 2005) ("Each party shall bear its own

costs associated with this motion."); Edelman v. Smith Barney, Inc., No. 98 Civ. 961 (CBM), 2000 WL 10209, at *6 (S.D.N.Y. Jan. 6, 2000) (denying attorney's fees on the ground that the movant had "presented no proof that this litigation was unnecessary or that the Smith Barney ha[d] been dishonest in any way").

Attorney's fees may be awarded, however, in limited circumstances in which "the opposing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Center Cadillac, Inc. v. Bank Leumi Trust Co. of N.Y., 878 F. Supp. 626, 628 (S.D.N.Y. 1995). Defendant cites Vari–o–Matic Mach. Corp. v. N.Y. Sewing Mach. Attachment Corp., 629 F. Supp. 257, 259 (S.D.N.Y. 1986), in arguing that fee shifting is appropriate to compensate a litigant (like himself) who should never have been forced to incur legal fees in the first instance. In Vari–o–Matic, the defendant represented to the court repeatedly that the case was settled, despite the fact that, at the time he made such representations, the settlement was never reduced to writing or signed by both parties in final form. See 629 F. Supp. at 258. The court awarded plaintiff reasonable attorney's fees after finding that defendant had acted in bad faith in requiring plaintiff to file a motion to enforce the settlement agreement.

The bad faith in Vari–o–Matic is not present in this case. The defendant in Vari–o–Matic blatantly lied and dishonored an agreement not to pursue the litigation. As a direct result of the defendant's dishonesty, the plaintiff was forced to seek the court's assistance in enforcing the settlement agreement. There is no evidence here that plaintiff sought to use the time since Mr. Campson's withdrawal to pursue her claims, advance the criminal or Family Court proceeding or otherwise initiate contact with law enforcement. Defendant has also not established that plaintiff intentionally prolonged the resolution of this case and opposed his motion to enforce the settlement agreement in order to harass him, delay the case, or for any other improper purposes.

Indeed, plaintiff may genuinely feel that the settlement agreement is no longer in her best interests. But a change of heart is not a basis to undo the agreement. See Powell, 497 F.3d at 129. Accordingly, defendant has not proven that plaintiff acted in bad faith and his application for attorney's fees is DENIED.

## V.       Plaintiff Proceeding Pseudonymously

"Identifying the parties to [a] proceeding is an important dimension of publicness. The people have a right to know who is using their courts." Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 190 (2d Cir. 2008) (quoting Doe v. Blue Cross & Blue Shield United, 112 F.3d 869, 872 (7th Cir. 1997)). When determining whether a plaintiff may be allowed to proceed under a pseudonym, "the plaintiff's interest in anonymity must be balanced against both the public interest in disclosure and any prejudice to the defendant." Id.

This case involves serious allegations that may irreparably harm the reputations of all involved. The parties, however, agreed to settle this action, in part, to close this painful chapter in their lives and move forward. Should the plaintiff elect not to comply with the terms of the settlement agreement, it is potentially unfair to allow such conduct to be carried out under the protection afforded by her anonymity. Accordingly, if the defendant is required to make a motion to compel hereafter, the parties are directed to brief the continued appropriateness of plaintiff proceeding pseudonymously. The plaintiff shall have 21 days from the date of defendant's motion to compel to file a submission (no longer than 10 pages) as to why she should be allowed to continue proceeding pseudonymously. Defendant will have seven days to submit a response (no longer than 10 pages). There will be no reply submission for this issue.

## CONCLUSION

Based on the foregoing reasons, defendant's motion to enforce the oral settlement agreement of October 26, 2016, is GRANTED and the terms of the settlement agreement as allocated in open court bind the parties. Defendant's application for attorney's fees is DENIED. The Clerk of Court is directed to terminate the motion at ECF No. 116 and close this case.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:       April 6, 2017
             New York, New York